## CHARLESTON.

STATE OF WEST VIRGINIA v. HENDERSON.

Submitted September 14, 1886.—Decided November 20, 1886.

1. FORGERY—INDICTMENT.

An indictment for uttering and attempting to employ as true a forged writing need not set out the whole writing. It is sufficient to give its purport and effect.

2. CRIMINAL PRACTICE—GRAND JURORS:

An indictment will not be quashed or abated, on the ground that one of the grand jury, who found it, was not a freeholder.

3. CRIMINAL PRACTICE—JURORS—VOIR DIRE.

After a jury has been sworn in a felony case, it is not error for the court at the instance of the State to examine a juror on oath to ascertain, whether or not he is a citizen of the State.

4. FORGERY—EVIDENCE.

A deed connected with a transaction, with which an alleged forged receipt is connected, is competent evidence on a trial for uttering such forged receipt.

5. FORGERY—EVIDENCE.

The note, which purports to have been paid with money, of the payment of which the alleged forged receipt is the evidence, is competent evidence upon a trial for uttering such forged receipt.

6. FORGERY—EVIDENCE.

Upon such trial it is proper to ask a witness as to the money mentioned in the note—"How was it applied?"—and to admit the answer—"It was applied on the land mentioned in the deed."

7. FORGERY—INDICTMENT—VARIANCE.

The receipt described in the indictment agrees with the receipt offered in evidence on the trial with the exception, that the en-

dorsement on the latter:—"Witness Susan M. Armstrong"—is omitted from the former:   HELD—No material variance.

8. FORGERY—EVIDENCE—RECORDS—DEPOSITIONS.

Upon the trial on an indictment for uttering and attempting to employ as true a forged receipt for money—knowing it to be forged—the record of a cause in chancery between the person so uttering and the person, whose name is alleged to have been forged, which record includes a deposition in behalf of the accused to the genuineness of the receipt, all tends to show, that the accused did utter and attempt to employ as true said receipt, and is competent evidence.

9. FORGERY—EVIDENCE—CONFESSION OF HANDWRITING.

Upon a trial for uttering a forged receipt witnesses may testify to the handwriting of the alleged forged receipt and being acquainted with the signature of the person, whose name is signed thereto, may in the presence of the jury write the letters of his name, as they think he writes them, and the jury may compare the letters so written with the letters in the alleged forged signature.

10. FORGERY—EVIDENCE—PROSECUTING WITNESS.

In this State there can be no "prosecutor" in a felony-case, and he, who has been injured by the felony, stands as any other witness and is not a party to the prosecution; therefore the general rule, that witnesses testifying in a cause may be cross-examined as to their feelings, bias, &c., towards either party to the cause, can not apply to such witness: and in the trial of a forgery-case this question propounded to a witness on cross-examination:—"Are you not indebted to the prosecuting witness?"—was incompetent, the bill of exceptions not showing any reason to take it out of the general rule; as that the question had been asked after he had been examined touching the reputation for truth of the "prosecuting" witness.

11. FORGERY—EVIDENCE—PECUNIARY CONDITION OF THE ACCUSED.

Upon such trial it is proper to inquire into the pecuniary condition of the person, in whose favor the alleged forged receipt purports to have been given at or about the date of such receipt.

12. FORGERY—EVIDENCE—CHANGE OF HANDWRITING.

Upon such trial it was not error to ask a witness, if the handwriting of the person, whose name was alleged to have been forged, had changed.

13. FORGERY—EVIDENCE.

Upon such trial the jury will not be permitted to receive the proved but not admitted signature of the person, whose name is alleged to have been forged, so as to compare the two signatures.

Much less would it be proper to permit evidence to go to the jury by a witness, that he had compared the alleged forged signature with one admitted to be genuine, and that they were exactly alike.

14.—FORGERY—EVIDENCE—REPUTATION OF THE ACCUSED—NEIGH-
        BORHOOD.

One, who is well acquainted with the members of a community, who best know the person, whose reputation for honesty is the subject of inquiry, is competent to give evidence as to reputation, and such evidence is not confined to his reputation in the immediate vicinity of his residence.

*C. C. Higginbotham* for plaintiff in error.

*Alfred Caldwell, Attorney-General,* for the State.

JOHNSON, PRESIDENT:

On the 4th day of June, 1885, John B. Henderson was in the Circuit Court of Upshur county indicted for forgery. On the 17th day of February, 1886, the prisoner demurred to the indictment, which demurrer was overruled; and thereupon the prisoner pleaded not guilty. On the 11th day of January, 1886, the trial of the prisoner before a jury commenced; and on the 23d day of the same month the jury rendered a verdict of "guilty as charged in the indictment." Whereupon the prisoner moved the court to set aside the verdict and grant him a new trial on the ground of erroneous rulings by the court during the trial as set forth in twenty-four bills of exceptions, which motion the court overruled; and the defendant excepted. The court then sentenced the prisoner to be confined in the penitentiary of the State for the term of two years.

To this judgment the prisoner obtained a writ of error.

Neither the evidence nor the facts are certified. The errors, of which the prisoner complains, are saved in his several bills of exceptions, which will be considered *se-riatim.*

The first error assigned is the overruling of the demurrer to the indictment. The indictment is good. The same particularity in the framing of indictments, that was required at common-law, is not now required. Sec. 6 of chap. 158 of the Code provides, that "in a prosecution for forgery or uttering or attempting to employ as true any forged instru-

ment or other thing, and in a prosecution for any of the of-
fences mentioned in chapter one hundred and fifty-six, it
shall not be necessary to set forth any copy or fac-simile of
such instrument or other thing; but it shall be sufficient to
describe the same in such manner, as would sustain an in-
dictment for stealing such instrument or other thing, sup-
posing it to be the subject of larceny." The indictment here
answers all the requirements of this statute. It charges—
" that John B. Henderson, to-wit, on the 3d day of February
in the year 1835, in said county feloniously did utter
and attempt to employ as true a certain forged writing
purporting to be a receipt purporting to be subscribed
by one Ebenezer Leonard, which said writing is of the
following purport and effect, to-wit :—'John B. Hender-
son this day paid me seven hundred and sixty-two dol-
lars and twenty cents, which is payment in full of a
note given by said Henderson to me on the 23d day of
June, 1869, *calling* for seven hundred and forty dol-
lars and payable one day after its date, I not being able
now to produce said note.—Witness my hand this 24th
day of December, 1869.—Ebenezer Leonard'—with intent
to defraud and with prejudice of the right of said Eben-
ezer Leonard, he, the said John B. Henderson, at the time
he so uttered and employed as true said forged writing
purporting to be a receipt, &c., well knowing the same
to be forged," &c. This would certainly be a sufficient
description of the receipt, if the indictment had been for
the larceny thereof. (*State* v. *Jackson*, 26 W. Va. 250;
*State* v. *Hurst*, 11 W. Va., 54; *State* v. *Poindexter*, 23
W. Va. 811). It is objected that the indictment is bad, be-
cause there is no averment therein, that the accused was in-
debted to Leonard. Such an averment never was under any
rule of law necessary in an indictment for forgery. The
court properly overruled the demurrer.

The first bill of exceptions is to the refusal of the court to
quash the indictment, on the ground that Alexander Riggs,
one of the grand-jurors, who found the indictment, was not
a freeholder, at the time the indictment was found. The
prisoner in support of his motion offered to introduce evi-
dence to establish that fact ; but the court overruled the mo-

tion and refused to permit the evidence to be offered. This was not error. The 12th section of chapter 138 of the Acts of 1882 provides, that "No presentment or indictment shall be quashed or abated on account of the incompetency or disqualification of any one or more of the grand-jurors, who found the same." But it is insisted by counsel for plaintiff in error, that sections 2, 3 and 4 of the same chapter require, that grand-jurors shall be freeholders, and that section 12 does not apply, as it would be in conflict with the said previous sections and destroy their effect. Section two, which provides, that the list, from which the grand-jurors shall be drawn, shall contain only freeholders, is clearly modified by section 12, which says in effect, that, if one drawn on the grand-jury is not a freeholder, that fact shall not vitiate an indictment found by him. This is a wise provision, because it would be very detrimental to the public interests, if perhaps a hundred indictments should be liable to be quashed or abated, because one, who was not a freeholder, happened to be placed on the list and was drawn as a grand-juror.

The court did not err to the prejudice of the prisoner in examining on oath the juror, Crawley, touching his citizenship. It seems from the exception, that, after the jury was sworn, the State moved the court to examine Crawley on oath to ascertain, whether he was a citizen of the State, which the court did and being satisfied of his citizenship permitted him to remain on the jury. This could not possibly have prejudiced the prisoner. What would have been the effect, if the court had been satisfied, that he was not a citizen of the State, and had required him to stand aside and had filled his place with another, is not raised and will not be decided.

The third bill of exceptions is to the admission of a copy of the deed from J. B. Henderson to Ebenezer Leonard for a tract of one hundred and seventy-three acres of land. This deed seems to be the one described in the bill of J. B. Henderson, which is set out in exception No. 11 and will be considered, when we discuss that bill of exceptions.

The fourth bill of exceptions is to the admission of the note described in the receipt set forth in the indictment. This exception is not insisted on here; and the evidence was manifestly proper.

The fifth bill of exceptions refers to the deed set out in bill No. 3 and the note in bill No. 4 and states, that the witness, Ebenezer Leonard, was asked the question—" How was that money to be applied?"—(meaning the money named in the note ); and against the objection of the prisoner the witness answered—" It was to be applied on the land specified in the deed." The sixth bill of exceptions sets forth the same facts, question and answer, and the further question—" How was the money called for in that note to be applied?"—to which against objection he answered—" It was applied as a payment on the land,"—(the land mentioned in said deed). The counsel for the plaintiff in error insists, that these questions and answers ought not to have been permitted, because they tended to contradict a writing, and because they were leading. They certainly did not tend to contradict the note. *Ruckman* v. *Lightner*, 24 Gratt. 19, is relied on. That case has not the slightest application. There the note was signed by Ruckman and Glendy; and they offered to prove, that they were only agents for the Confederate government. The court held, that parol evidence was not admissible to prove, that Ruckman was acting as the agent of the Confederate States' government, and that the note was given for the price of cattle purchased for that government. But it is farther objected, that the questions were leading. A question is not open to the objection of being leading, unless it in some manner indicates to the witness the answer desired. ( *Remmerer* v. *Edelman*, 23 Pa. St. 143; *Spear* v. *Richardson*, 37 N. H. 23; *Floyd* v. *State*, 30 Ala. 511; *Floyd* v. *Buford*, 17 Tex. 152). These questions do not indicate the answers sought and are unobjectionable.

The seventh bill of exceptions sets out the facts, questions and answers, as they appear in the fifth and sixth bills, and then this further question asked of the same witness—"State whether or not a settlement was made between you and John B. Henderson, the prisoner, in which the money on this note (meaning said note) was applied on the purchase-money of the land (meaning said land). If so, when and where?"—which question against the objection of the prisoner the witness answered—"It was a settlement we made at Walter

Philips's store and closed same day at M. A. Darnall's on the 7th day of September, 1872. Dr. J. J. Morgan made the calculation." It is objected, that this was irrelevant and prejudicial to the plaintiff in error, and that the question was leading.

It was not irrelevant nor prejudical; for, it is evident, it tends to show, that Henderson had settled for the very note, which, he afterwards tries to show, that he paid. It is one of the steps tending to show, that he had uttered the forged receipt, when he knew it was forged. The question certainly was not leading for the reasons already stated. A question to a witness in the words—"Whether or not"—is not ordinarily objectionable as leading. It may be so, if it be otherwise in such terms, as from the nature of the question in connection with its subject-matter suggest to the witness the answer desired. (*Bartlett* v. *Hoyt*, 33 N. H. 151; *Leman's Case*, 6 Gratt. 684.) In the Virginia case the questions were—"State whether or not you examined the horse-tracks towards Origan's"—"State whether or not you had any difficulty in following the tracks." In the New Hampshire case the question proposed was—"State whether or not the hay, which you saw Demarett's team hauling to the Denham depot, was a part of the lot, you have described as sent by the plaintiff to your brother, N. Nute, in Boston." The court said, this was not a leading question, and further:—"It would be difficult perhaps to propose the question in terms better adapted to avoid leading the mind of the witness to the answer, without making it so general, as to fail to direct his attention to the particular, in relation to which his information was sought."

The eighth exception is to the admission of the receipt, which was alleged to have been forged, and the purport of which is set out in the indictment. It is insisted, that there is a variance between the receipt and that described in the indictment. The only particulars, in which it can be pretended, that there is a variance, are the following: The receipt is dated—"this 24th of December, 1869"—while the description in the indictment is—"this 24th December, 1869"—and the description in the indictment omits entirely these words, which appear in the receipt—"Witness—Susan M.

Armstrong." There is no material variance in the date, even if it were required, as it is not, to set out the receipt literally. (*Burress's Case*, 27 Gratt. 984). In *Perkins's Case*, 7 Gratt. 654, Lomax, J., said : "The court is of opinion, that, as this prosecution was only for forging the writing, which purported to be a negotiable note, there was no necessity, that the indictment should set out the endorsements or any other matter upon the same paper constituting no part of the note itself and not entering into the essential description of that instrument. It is enough to set out in the indictment the note itself without any other extrinsic marks or writings on the same paper. (*Commonwealth* v. *Ward*, 2 Mass. 397 ; *Simmons* v. *The State*, 7 Ham. (Ohio) Pt. 1, p. 116). When the paper with these unessential marks and writings is offered in evidence for the purpose of sustaining the prosecution for the forgery of the note, there will be no valid objection on the ground of variance between the proofs and the charges laid in the indictment."

In *Burress's Case*, 27 Gratt. 934, it appeared that the indictment was for the forgery of an order ; and on the order was written : "Richmond, March 5th, 1875, received of T. A. Parker & Co. forty-seven 23-100 dollars in full of this order—Thomas Moore."—Moncure, P., for the court said : "Certainly the receipt at the foot of the said paper, and the absence of such receipt at the foot of said order constitute no variance. The receipt is not charged to be forged. In fact it is a genuine instrument."

In *Poindexter's Case*, 23 W. Va. 811, this Court said : "This count of the indictment did not profess to set out the tenor, which imports a *verbatim* copy of the check, but only its purport and effect, which means the legal effect of the instrument as a whole."

The statute, which we have before quoted, declares : "It shall not be necessary to set forth any copy or fac-simile of such instrument or other thing ; but it shall be sufficient to describe the same in such manner, as would sustain an indictment for stealing such instrument or other thing, supposing it to be the subject of larceny." The indictment does not profess to give a copy of the receipt but describes it as

"of the following purport or effect." Now it does seem to us, that, if it were the subject of larceny, it is sufficiently described. (Even where by the statute of limitations there is a difference in the time when a note witnessed, and one that is not, is barred, it is not necessary to notice in the declaration on such note, that the note was witnessed.) After plea of the statute of limitations the fact, that there was a witness to the note, can be set up by way of replication. (*Smith* v. *Dunham,* 8 Pick. 246.) The variance was not material; and the court did not err in admitting the receipt.

Bills of exceptions Nos. 9, 10, 11, 12 and 13 are to the admission in evidence of parts of the record in a chancery suit of J. B. Henderson against Ebenezer Leonard and others. Bill No. 9 is to the admission of the bill in said cause—No. 10 to the answer of Leonard and order filing the same—No. 11 sets out the bill, answer of Leonard, the general replication to the answer, the special replication of Henderson to the answer, to the introduction of which special replication the prisoner excepted. No. 12 is to the admission of the order of reference in said cause. No. 13 is to the deposition of Susan M. Armstrong taken in said cause. This bill among other things alleges the sale of a tract of land by Henderson to Leonard and the execution by Leonard of certain purchase-money-notes; that on the 1st day of April, 1869, he conveyed to Leonard a tract of 173 acres of land retaining a vendor's lien, which deed purports to be filed marked Exhibit "C." He says, for this sale no bonds or notes were delivered to him by Leonard. He prays that a survey of the two tracts of land may be had in order that their true boundaries may be ascertained, and that the metes and bounds of said land may be corrected, and that the land may be sold to pay the purchase-money. The answer of Leonard among other things after averring the payment of large sums of the purchase-money says: "That on the 7th day of September, 1873, he held against the plaintiff the following. notes, bonds and claims other than those herein mentioned, to-wit: A note executed by plaintiff to defendant *dated the 23d day of June, 1869,* calling for $740.00 payable one day after its date," &c. He then sets up a settlement made between them, in which, he says, it was agreed,

that his claims against Henderson amounting to $3,036.03 should be applied as a payment on the land; and on the day, the deed dated April 1st, 1872, was acknowledged, to wit, on the 7th day of September, 1872, it was so applied. He admits, that $200.00 only of the purchase-money remains due, and states, that he has been ready and willing to pay that, whenever it should be ascertained, to whom it ought to be paid, and tenders the $200.00 with his answer. The plaintiff, Henderson, was permitted to file a special replication to the answer, in which he denies, that he agreed, that said money should be applied on the land, and denies, that it was so applied. He also in said special replication says, that "the cause of action on the note for $740.00 executed by the plaintiff to said Ebenezer Leonard dated June 3, 1869, and due one day after date in the answer mentioned accrued more than ten years before the institution of this suit; that the same is barred by the statute of limitations, and the plaintiff relies on said statute."

The case was referred to a commissioner on the 13th day of June, 1882, among other things to ascertain and report : " What balance of purchase-money remains due from said Leonard to the plaintiff after applying payments and sets-off, to which he is legally entitled." On the 11th day of January, 1885, a notice of Henderson to Leonard to take the deposition of Susan M. Armstrong was served. Pursuant to said notice her deposition was taken on the 26th day of January, 1885, before Phil. A. Lorentz, a justice, who certified the same. The receipt described in the indictment with the words thereon—" Witness—Susan M. Armstrong," was shown to the witness ; and she was asked to examine it and state, whether she witnessed it or not. She answered :—"I have examined said writing and recognize my signature as a witness thereto and remember of seeing the receipt drawn and seeing Ebenezer Leonard sign his name to the same." The next question was :—" At whose instance did you witness said writing?" She answered :—"I don't remember, at whose instance I witnessed the said writing; but I remember Mr. Ebenezer Leonard and my brother, John B. Henderson, were both present, when I witnessed said writing; and I here file said writing as part of my deposition marked Exhibit S."—

It was shown at the trial of Henderson on the indictment by the evidence of said justice Lorentz, who took the deposition, that Henderson was not present at the taking of the deposition; but the questions in said deposition were found by the justice at his house, on the day the same was taken, having been left there. The replication further shows, that Susan M. Armstrong, a witness for the prisoner on the trial, stated in her evidence, that Henderson and his counsel had been there the day before and left said questions to be propounded to her.

It must be remembered, that the indictment is not for forgery but for " feloniously uttering and attempting to employ as true " the forged receipt knowing it to be forged. Of course in the trial of the prisoner the State would have to prove beyond a reasonable doubt, that the receipt was a forgery. It must be supposed, that that was done, as neither the facts nor the evidence is certified. The State was also bound to prove beyond a reasonable doubt, that the prisoner knowing, that the said receipt was forged " feloniously uttered and attempted to employ it as true." The record objected to was evidence tending to prove, that Henderson did utter and attempt to employ as true said receipt. This is shown by the deposition of Susan Armstrong taken in the chancery suit. She swears, that the receipt was genuine in answer to questions written by the prisoner. He had the receipt filed with her deposition and returned therewith and filed in the chancery cause. If the State could not use this record, it might entirely fail to elicit the truth. We can see no objection to the evidence. It was an act of the defendant deliberately done, which tends to prove the very fact in issue. Every thing said or done by the accused in the prosecution of said attempt to utter the receipt and employ it as true with the knowledge of its forgery for the purpose of obtaining credit for the money mentioned in the receipt was " an attempt to employ as true " such writing within the meaning of the statute. ( *Cahoon's Case*, 20 Gratt. 794). In *Sands's Case*, 20 Gratt. 800, there was a forgery of the name of Haunstein, a foreigner, to a bond payable to one Thompson. Suit was brought on the bond after Haunstein's death, and judgment was recovered. A chancery suit was

instituted to have the money paid out of Haunstein's estate, and the court held, that both the record in the law court and that in the chancery court were admissible against the prisoner charged with forgery and with uttering and attempting to employ as true the forged bond. The court held the records admissible to show the uttering of the forged papers and the complicity of the prisoner in the uttering.

The court below did not err in admitting the several portions of the record excepted to, nor in admitting the deed mentioned in the Bill of Exceptions No. 3. It was referred to in Henderson's bill and was so connected with the charge, as to be relevant and proper evidence.

Bills of Exceptions Nos. 14, 15, 16 and 17 are to the permission given by the court to witnesses J. J. Morgan, Levi Leonard, Ashley Gould, and Wealthy Leonard respectively to write the letter " L " in the presence of the jury, as they, the witnesses, thought Ebenezer Leonard wrote it, and show it to the jury, and for the jury to compare the letter written by each of these witnesses with the " L " in Leonard's name signed to the receipt alleged to be a forgery. The objection urged to this is, that it is a comparison of handwriting by the jury, which, it is alleged, is not allowable, and the following authorities are cited: *Rowt* v. *Kile,* 1 Leigh 216 ; *Burress's Case,* 27 Gratt. 946 ; *Clay* v. *Alderson,* 10 W. Va. 50. It is true, as these cases hold, that it is not allowable to lay other proved but not admitted specimens of the party's handwriting before the jury for the purpose of permitting them to judge by a comparison thereof with the signature in question, whether the said signature is not genuine. But here no such thing was permitted. The jury was not asked to compare different signatures of Leonard with his name signed to the alleged forged receipt. The witnesses were only asked to write an " L " as they thought Leonard wrote it, so that the jury could the better understand the testimony. If a jury do not have a clear idea of the location of a place, where an act is alleged to have been done, no one doubts the right of a party to have a witness describe the place and by a word-painting of it and its surroundings make its location clear to the minds of the jury. What objection then can there be to the permitting of the witness to make

in the presence of the jury a diagram of the place to enable the jury the better to understand the witness? There can then be no valid objection to the permitting of the witnesses in their attempt to describe how Ebenezer Leonard wrote the letter " L " to illustrate their meaning by writing the letter themselves, so that the jury could see whether or not it was in fact different from the alleged simulated " L."

The bills of exceptions Nos. 18 and 19 were to the refusal of the court on cross-examination to allow the following question to be propounded to and answered by the witnesses, Simpson and Levi Leonard :—"Are you indebted to the prosecuting witness, Ebenezer Leonard?"—Mr. Wharton (Crim. Ev. § 477) says :—"A witness may be compelled to answer questions concerning his relationship to the prosecution or defence, his interest in the suit, his capacity of discernment and expression, his motives and his prejudices. He may thus be required to explain whatever would show bias on his part or incapacitate him to testify correctly."—In 2 Hale P. C. 276-7 it is said :—"Exceptions to the credit of the witness do not at all disable him from being sworn but yet may blemish the creditability of his testimony ; and in such case the witness is to be allowed to testify, but the credit of his testimony is left to the jury, who are judges of the fact and likewise of the probability or improbability, credibility or incredibility of the witness and his testimony ; and these exceptions are of that great variety and multiplicity, that they can not easily be reduced under rules or instances."

It is well settled, that on cross-examination a witness may be examined as to his *animus* towards the party, against whom he is giving testimony, and as to any statements made by him indicating feelings of hostility to the party, against whom he is called; and, if he denies making any such statements, they may be proved by other witnesses. (*Newton* v. *Harris*, 2 Seld. 345; *Drew* v. *Wood*, 6 Foster 363; *Martin* v. *Farnham*, 5 Foster 195; *Atwood* v. *Welton*, 7 Conn. 66; *Long* v. *Lamkin*, 9 Cush. 361; *Harris* v. *Tippett*, 2 Campb. 537; *Day* v. *Stickner*, 14 Allen 255; *Bixby* v. *The State*, 15 Ark. 395; *Fincher* v. *The State*, 58 Ala. 215; *Blessing* v. *Hope*, 8 Md. 31.) If there is peculiar friendship for the party, for whom he is called, that may be shown on cross-examina-

tion. *(Drew* v. *Wood*, 6 Foster 363). It has been held, that a witness on cross-examination may be asked :—"Were you not then under the influence of ardent spirits ?"—*(Pool* v. *Pool*, 33 Ala. 145). It has been held, that the witness may be asked, *whether or not he has made a bet, that the party calling him would recover.* (*Kellogg* v. *Nelson*, 5 Wis. 125). In that case Whiton, C. J., said :—"On the cross-examination of a witness anything, which shows his friendship or enmity to either of the parties, is commonly a proper subject of inquiry. So also is anything, which tends to show, that in the circumstances, in which he is placed, he has a strong temptation to swear falsely. It is to be remembered, that the jury are the sole judges of the credibility of the witness, and whatever tends to assist them to form a judgment upon this subject should not be withheld from them.     *     *     *     The right of counsel to cross-examine a witness upon these subjects must of course be restrained within reasonable limits and must *commonly* be exercised subject to the discretion of the judge, before whom the case is tried ; but, where a question is propounded with a view to show, that the witness has conducted himself very improperly in relation to the suit, in the trial of which he is called to testify, we think, the ruling of the judge, by which inquiry into the subject is prevented, is so erroneous, as to justify a reversal of the judgment.

In *Hutchinson* v. *Wheeler*, 35 Vt. 330, it was held, that, where a witness on the part of the plaintiff was asked on cross-examination, if the plaintiff had not assisted him in a lawsuit, which the witness had had with the defendant, it was not only held competent, but also that the defendant could contradict the answer of the witness, that he had not had such assistance from the plaintiff.

Where in the trial of several defendants on an indictment for riot it appeared, that a secret society had been organized for the purpose of repressing the class or sect, to which the defendant belonged, it was held to be competent to require a witness, who had been called and testified on the part of the prosecution, to answer on his cross-examination, whether he was a member of such secret society. (*The People* v. *Christie,* 2 Park. Cr. Rep. 579.)

In general terms in *Ray* v. *Bell*, 24 Ill. 444, it was held,

that great latitude is permitted on the cross-examination of a witness, and questions calculated to elicit answers, which will be likely to affect the standing of the witness, should be allowed. The question in that case was as to what the witness had sworn on a former trial.

It of course is competent to show on cross-examination, that the witness is interested in the result of the suit. ( ——— v. *Bonnell*, 33 Wis. 180.)

In *Winston* v. *Cox*, 38 Ala. 268, it was held, that in cross-examining a witness for the purpose of testing his credibility it is permissible to investigate his situation in reference to the subject-matter of the suit, his relations towards the parties, his interests, prejudice and motives; and if it appears, that his testimony tends to relieve him of the imputation of negligence in connection with the subject-matter of the suit and was in conflict with the testimony of other witnesses, the appellate court will not reverse on account of the latitude allowed in the cross-examination, unless the record plainly shows, that an improper indulgence was given. To same effect is *Stondenmeier* v. *Williamson*, 29 Ala. 558.

In *Newcomb* v. *The State*, 37 Miss. 383, it was held, that it is a general rule, that anything legitimately tending to show, that a witness is under undue feeling or bias for or against a party to the issue, may be shown to the jury to enable them properly to weigh his testimony; and that this rule applies to statements made and acts done by the witness in relation to the subject-matter of the issue, and which shows his bias or feeling towards a person involved in the transaction, which gave rise to the issue; and hence in a trial for murder a witness for the defendant may be asked by the State, *if she did not say to a person designated and at a time mentioned, that, if the accused did not kill the deceased, she would not own him for her son.*

It was said by the Supreme Court of California : " We are inclined to agree, that courts are apt to take a too narrow view of the rights of the examiner in such cases and to give too extended a scope to the rule, that a cross-examination is to be confined to the subject-matter of the evidence in chief. Undoubtedly the cross-examination can not go beyond the matter ; but it ought to be allowed a very free range within

it. In order to do this the witness may be sifted as to every fact touching the matter, as to which he testifies, so that his temper, leanings, relations to the parties and the cause, his intelligence, the accuracy of his memory, his disposition to tell the truth, his means of knowledge, his general and particular acquaintance with the subject may be fully tested. Much must be left to the discretion of the counsel on this subject." (*Jackson* v. *Feather River Water Co.*, 14 Cal. 24; *Harper* v. *Lamping*, 33 Cal. 648).

We have made quite an extensive review of the authorities on this subject and have discovered upon what Mr. Wharton founded his text; yet we have failed to find a single adjudicated case, in which it has been held, that, even where a witness in a civil case has been examined, the question has been asked on cross-examination, whether the witness was indebted to the person calling him. There might be a case, in which such a question under the general rule would be proper. If an action were brought against a person to recover a large sum of money on a note or bond, and the defendant pleaded *non est factum*, and a witness was called for the defendant, to whom the defendant owed a large sum of money, the collection of which might be very doubtful, unless the plea was sustained, we do not say, it would not be proper in such a case to permit the witness to be asked on cross-examination, whether the defendant did not owe him a large sum of money, which he would be in danger of losing, if the plaintiff recovered. But even in a case like that, I can not see, how the witness would be liable to bias in the defendant's favor because he owed the defendant, nor what good purpose would be promoted by asking the witness on cross-examination, if he owed the defendant. If it would be proper in such a case, could it be extended to a criminal prosecution, and he be asked, if he owed another witness, to-wit, the prosecuting witness. If such a question were proper, and the witness should answer, that he was indebted to him, then of course it would be proper for the other party to ask him, how much he owed, and whether he had the means of immediate payment, &c., so as to show, that his embarrassment from the debt could have no effect on the testimony he might give. It seems to me, that such evi-

dence would have entirely too remote a bearing upon the issue; and, if the rule should be extended so far, it would subserve no good purpose and would only needlessly prolong criminal trials.

In this case Ebenezer Leonard can not with any propriety be called the prosecuting witness. For aught that appears in the bill of exceptions, Leonard was entirely indifferent as to the result of the prosecution. For aught that appears in these two bills of exceptions, it may have been the desire of Leonard, that the defendant should be acquitted. We can not look to any other bill of exceptions to aid us in deciding the question raised in these two, as no others are referred to therein. Leonard was not the prosecutor and in a felony-case could not be. He was not responsible for costs; and the conviction of Henderson could not aid him in his civil suit, if he had one. He may have received all the satisfaction in such suit, that he desired. In certain misdemeanor cases the party complaining may be required to enter himself as prosecutor. The Code, sec. 2, chap. 158, provides: "In a prosecution for a misdemeanor the name of the prosecutor, if there be one, and the county of his residence shall be written at the foot of the presentment or indictment, when it is made or found; and for good cause the court may require a prosecutor to give security for the costs, and, if he fails to do so, dismiss the prosecution at his costs."

There can be no requirement for a prosecutor or any security for costs in a felony-case. Therefore Leonard stands in this case like any other witness. He is not a party to the prosecution and has no pecuniary interest in it; and from the facts disclosed in the two bills of exceptions we can see no propriety whatever in permitting him to be asked, whether or not he was indebted to another witness in the case. In the light of the authorities the words of Mr. Wharton (Crim. Ev., §477):—"A witness may be compelled to answer questions concerning his relationship to the prosecution or the defence"—must be understood to mean not the *prosecuting witness* but the State, which is always the party prosecuting a felony-case.

The general rule evolved from the cases, which we have cited, is applicable to bias &c. towards one of the parties to

a suit. In a felony-case the State is the plaintiff, and the accused is the defendant; and all the interest, bias, &c., is in favor of one or the other. It might be in a prosecution for a felony, that the prosecuting witness is the most unwilling witness called. It sometimes happens, that the accused is on trial for forging the name of his father, who has been forced to appear before a grand-jury to give evidence against him and then before the petit-jury to testify against him there, and has all the feelings and bias, which can exist in a father's heart, in favor of his son. He is in no sense a prosecutor. The general rule, as we have seen, does not apply to the witnesses in a cause, who are not parties to the suit. One exception to this occurs to me, there may be others :—Where one of the witnesses is being impeached for bad character, and thus a sort of side-issue is made, the witnesses may be asked on cross-examination as to their feelings, bias, &c., for or against the witness, whose character is the subject of inquiry. If such a case exists, it must appear in the bill of exceptions, before we would inquire, whether the general rule applied to the case. Such a case does not appear in these two bills of exceptions. The court did not err in excluding the question.

Bill of exceptions No. 20 is to the following question asked witness Vincent :—"On or before the 24th day of December, 1869, what was John B. Henderson's pecuniary condition?" —and to the following answer by Vincent :—"In 1868 he" (meaning John B. Henderson) "owed me some money, that he said he could not pay me; but in March he paid me a little. He told me in 1869, he had no money."—December 24, 1869, is the date of the alleged forged receipt. In *Chahoon's Case*, 20 Gratt. 733, and in *Sands's Case,* Id. 800, it was held on the trial for the forgery of a bond of one, who was then dead, that it was competent to prove, that he, whose name was alleged to have been forged to the bond, was prompt in the payment of his debts, and that he owned large property real and personal and was doing a good business. For the same reasons it was competent in this case before us to prove, that he, in whose favor the alleged forged receipt was drawn showing the payment by him of a large sum of money, was at the date thereof in such embarrassed circumstances,

that it is improbable, he could have paid so large a sum. The evidence was competent and was properly allowed to go to the jury to be by them weighed, for what it was worth, with the other evidence in the case.

Bill of exceptions No. 21 was to the evidence of Henry J. Heffner admitted against objection. The question propounded was :—"State, whether, during the time you have been acquainted with the handwriting of Ebenezer Leonard, it has always been the same, or whether there has been a change in it." The reply was :—"I say, he has always written the same hand. It has always been the same kind of a hand."—The circumstances, in which this evidence was admitted, are not set forth in the bill of exceptions. It may be, that evidence had been introduced on behalf of the prisoner tending to prove that the handwriting of Leonard had changed. If so, there can be no doubt of the propriety of the evidence excepted to in this bill of exceptions. Nothing in the record shows, that the prisoner was or could have been prejudiced by its admission.

Bill of exceptions No. 22 was to the refusal of the court to admit the evidence of John L. Hurst. The prisoner proposed to prove by Hurst, that some time in the fall of 1885 the witness was in the office of A. M. Poundstone, prosecuting attorney of Upshur county, and in the presence of said Poundstone and Ebenezer Leonard, the prosecuting witness, was shown the alleged forged receipt and another paper-writing with said Leonard's signature thereto, which said Leonard then and there admitted was his signature ; and he, the witness, was asked then and there to compare the two signatures, which he did, and they were almost exactly alike, so nearly alike, that one could not be distinguished from the other.—The proposed evidence was clearly incompetent. We have seen, that the same could not have been made by the jury. Certainly a witness could not be permitted to testify, that he had at another time made the comparison, and to detail such comparison to the jury.

Bill of exceptions No. 23 was to the evidence of Jonathan Heffner as to the reputation of John B. Henderson for honesty. The bill shows, that the prisoner had introduced evidence to show, that his reputation for honesty was good ;

and the following question was propounded to Heffner:—
"Are you acquainted with the general reputation for honesty of John B. Henderson among his neighbors and acquaintances?"—To this question the prisoner objected; and the court overruled his objection. A controversy then arose between the counsel for the State and the counsel for the prisoner as to the definition of the phrase "neighbors and acquaintances;" and the counsel asked the court to define the same. Thereupon the court defined the phrase as follows:—"Neighborhood means the neighborhood, in which the party resides, which includes where he moves and circulates and transacts his business, and attends church, stores, mills and mixes generally with the people in the usual calls of life, and is best known, not extending to any great number of miles, and not extending beyond the same immediate section of his residence, and such acquaintance must be within that limit."—To this definition the prisoner objected, which objection was overruled and the definition read to the witness, who then answered:—"I am. I live twelve miles from where John B. Henderson lives. He lived in my neighborhood about seventeen years ago and has not lived there since. He frequently passes backward and forward through my neighborhood. I don't know his general reputation for honesty, where he now lives; but I know some people on that side of Buckhannon river, and he transacts business within my neighborhood and associates with them, and they are well known to him and he to them, and has been for many years, and he owns a farm four or five miles from my neighborhood and is frequently there."— Thereupon the counsel for the State asked the witness:— "What is John B. Henderson's general reputation for honesty among his neighbors and acquaintances?"—To which he answered:—"It is not very good."

The regular mode of examining into general reputation is to inquire of the witness, whether he knows the general reputation of the person in question among his neighbors, and what that reputation is. In the English courts the course is further to inquire, whether from such knowledge the witness would believe that person upon his oath. In the American courts the same course has been pursued. In answer to

such evidence the other party may cross-examine the witnesses as to their means of knowledge and the grounds of their opinion, or may attack their general character, and by fresh evidence support the character of his own witness. The inquiry must be made as to his general reputation, where he is best known. It is not enough, that the impeaching witness professes merely to state what he has heard "others say"; for those others may be but few. He must be able to state, what is *generally said* of the person by those, among whom he dwells, or with whom he is chiefly conversant; for it is only this, that constitutes his general reputation. And ordinarily the witness ought to come himself from the neighborhood of the person, whose reputation is in question. If he is a stranger sent thither by the adverse party to learn his reputation, he will not be allowed to testify as to the result of his inquiries; but otherwise the court will not undertake to determine by a preliminary inquiry, whether the impeaching witness has sufficient knowledge of the fact to enable him to testify, but will leave the value of his testimony to be determined by the jury. (Greenl. Ev. § 461).

I do not see, how it is possible, that the definition by the court of the phrase "neighbors and acquaintances" could have prejudiced the prisoner. It is not necessary for us to determine, whether said definition is or is not entirely correct. The manifest object of the rule is to find out the general reputation of the person sought to be impeached or sustained; and certainly where a man is well known, he has a reputation either for honesty or dishonesty. Any one, who is well acquainted with those, with whom such a person associates, and who knows him well, is competent to speak of the reputation, he has among them. Heffner had this knowledge and states what Henderson's reputation was among those, with whom he associated. Suppose the witness had answered the first question—Yes—and then stated, what the reputation was, and on cross-examination had stated the same means of knowledge, which he stated on his direct examination, his evidence would not have been excluded. It would have been left to the jury to say, what weight it should have. Under the circumstances shown in the bill the court did not err in admitting the evidence.

Bill of exceptions No. 24 was to the admission of the evidence of Dr. Newlon. He was asked the same question propounded to Heffner. He answered:—"I live in the town of Buckhannon six or seven miles from where John B. Henderson lives—I am not so well acquainted with his reputation there as in Buckhannon. I rode deputy sheriff including that section from 1877 to 1880, inclusive, and practiced medicine in that county. He frequently comes to this place, transacts business, attends court. He is well known to the people of this place and has been for many years. I know his general reputation for honesty at this place."—Being asked:—"What is that reputation"—He answered:—"Not very good."—Dr. Newlon showed, that John B. Henderson had a reputation for honesty in Buckhannon; and it was competent for him to tell the jury what it was. It would be a very narrow view of the subject to say, that a man had no reputation for honesty except in the immediate vicinity of his residence. He might not have much dealing with his immediate neighbors but might do all his dealing a dozen miles away. Many merchants in cities spend only the nights and Sundays at their homes, which are many miles away from their places of business, and they are not as well known as to their honesty, where they reside, as where they do business. It would be absurd to say, that no inquiry could be made about their reputation except in the immediate vicinity of their homes. The best evidence of a man's reputation is the opinion of him expressed by the community, who know him best.

We see no error in the judgment of the Circuit Court; and it is affirmed.

AFFIRMED.